**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| CITY OF FLORENCE, SOUTH CAROLINA | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 4:25-cv-04692-JDA |
| v. | ) | |
| | ) | |
| 3M COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANT 3M COMPANY'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS**

South Carolina law does not make a manufacturer liable for its customers' disposal practices of the waste coming from the manufacturer's lawful product. Plaintiff City of Florence nevertheless wants Defendant 3M Company to pay for the consequences of waste discharges allegedly made by scores of unnamed, non-party entities who used products that contained (or degraded into) those chemicals and that those entities supposedly purchased from 3M. The City's theory for holding 3M liable is that 3M placed lawful products containing certain forms of PFAS in the stream of commerce, and that those non-party entities—hereinafter referred to as the "PFAS Users"—contaminated the City's drinking water supply by improperly discharging certain per- and polyfluoroalkyl substances ("PFAS") into waterways that are the source of that drinking water. The City's claims should be dismissed for the following reasons:[1]

_____

[1] 3M has moved to transfer this case—as well as the eight other substantively identical District of South Carolina cases brought by the same Plaintiffs' counsel—to Judge Richard M. Gergel in

*First*, there is no cognizable (or coherent) legal theory that would allow the City to recover money it has not spent based on conduct that took place over twenty years ago. Either the City's claims are time-barred, given that the City sued well more than three years after it became aware it had a cause of action. Or the claims fail because it cannot establish its entitlement to monetary relief for harm that has not and may never come to pass.

*Second*, the City cannot bring claims against 3M for private nuisance (Count I) or public nuisance (Count II) because 3M does not control the alleged nuisance.

*Third*, the City's trespass claim (Count III) fails because the City fails to allege that 3M engaged in any intentional act physically invading the City's properties.

*Fourth*, the City's negligence claim (Count IV) fails because the City cannot establish, as a matter of law, that 3M owed it a duty.

*Fifth*, the City's strict liability claim for ultrahazardous activity (Count VI) fails because manufacturing or selling chemical products is not an ultrahazardous activity subject to strict liability under South Carolina law.

*Sixth*, the City's strict liability claim for design defect (Count VII) fails because it has not adequately pleaded that 3M's products were defective or unreasonably dangerous.

*Seventh*, the City's strict liability claim for failure to warn (Count V) fails because the City has failed to adequately allege that 3M had a duty to warn it, and that a warning would have made a difference in the City's behavior.

---

connection with his role as the presiding judge in MDL No. 2873, *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 2:18-mn-2873-RMG (D.S.C.) (the "AFFF MDL"), which is pending in the Charleston Division, pursuant to 28 U.S.C. § 1404, Local Civil Rule 3.01(C), and Case Management Order No. 1 entered in the AFFF MDL (2:18-mn-2873-RMG, Dkt. No. 3). 3M's motion remains pending. *See* Doc. 12.

*Eighth*, the City's claim for breach of implied warranty (Count VIII) fails because the City has failed to allege that it ever purchased anything from 3M, much less relied on any warranty, implied or otherwise, arising out of such a purchase.

## FACTUAL BACKGROUND

The City, a municipal corporation, owns and operates the Pee Dee Regional Water Treatment Plant (a surface water treatment plant, or "SWTP"). Compl. ¶¶ 3, 14–15. The City collects water from an intake located on the Great Pee Dee River, the SWTP treats the water, and the City sells the water to the citizens of Florence County. *Id.* ¶ 15–16.

The City does not allege that 3M discharged PFAS. The City instead asserts that 3M sold products containing PFAS to the non-party PFAS Users. According to the Complaint, the PFAS Users have operated and/or currently operate facilities located upstream of the City's intake. *Id.* ¶ 44. The PFAS Users allegedly "use, or used, 3M's PFAS-containing products in their industrial processes," which "generate wastewater containing 3M's PFAS." *Id.* ¶ 45. The PFAS Users allegedly "disposed of the PFAS-contaminated wastewater by discharging it directly, or indirectly via public [wastewater treatment plants], to surface waters." *Id.*

Of the "thousands of different PFAS chemicals," the Complaint focuses on five in particular: PFOA, PFOS, PFHxS, PFNA, and PFBS. *Id.* ¶ 25. According to the Complaint, it is these kinds of PFAS that are allegedly associated with "negative health effects." *Id.* Last year, EPA finalized regulations (under the Safe Drinking Water Act) setting Maximum Contaminant Levels ("MCLs") for these five substances. *Id.* ¶ 37; PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32,532.[2] This year, EPA announced it would retain the MCLs for PFOA and PFOS

---

[2] The Complaint also mentions Maximum Contaminant Level Goals ("MCLGs"), *see* Compl. ¶¶ 33, 34, 37–38, 41, 44, 81–82, 112, but (as their name suggests) these goals are not enforceable and do not impose legal obligations on anyone. 89 Fed. Reg. at 32563 ("MCLGs are not regulatory levels and are not enforceable.").

but would rescind them for the three other substances.  Compl. ¶ 41 (citing U.S. EPA, *EPA Announces It Will Keep Maximum Contaminant Levels for PFOA, PFOS* (May 14, 2025) (hereinafter *EPA 2025 Announcement*)).  Under the to-be-revised regulations, public water systems must begin conducting monitoring for PFOA and PFOS by 2027 and, by 2031, must ensure that their drinking water does not exceed the MCLs for those chemicals.  *Id.* ¶ 42; *EPA 2025 Announcement*.  The federal government will make available $1 billion in funding "to help states and territories implement PFAS testing and treatment at public water systems."  EPA, *Final PFAS National Primary Drinking Water Regulation*.[3]

As a result of EPA's revised guidance, public water systems' federal obligations concern two chemicals 3M has not manufactured and sold for over twenty years.  In "2000, 3M announced that it would be phasing out its manufacture and sale of products based" on PFOA and PFOS.  Compl. ¶ 62.  "[B]y 2002," 3M had completed that phase-out.  *Id.*

Some 23 years later, the City has now sued 3M for PFAS others have allegedly discharged into its water supply.  The City asserts eight claims against 3M: for private nuisance, public nuisance, trespass, negligence, three theories of strict liability (ultrahazardous activity, failure to warn, and design defect), and breach of implied warranties.  The City seeks damages and what it calls "injunctive relief requiring [3M] to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at Plaintiff's SWTP."  *Id.* ¶ 7.  The City does not allege it has spent any money on these water treatment technologies or that it has imminent plans to do so.

---

[3] *Available at* https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.  *See* Compl. ¶ 37 n.15 (incorporating that page by reference).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, the plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the Court must accept well-pleaded factual allegations as true, "labels and conclusions" and "naked assertion[s] devoid of further factual enhancement" are insufficient to state a claim. *Id.* To be "plausible," an allegation must do more than present "a sheer possibility that a defendant has acted unlawfully." *Id.* In determining whether there is a plausible claim for relief, the Court must make a "context-specific" judgment by "draw[ing] on its judicial experience and common sense." *Id.* at 679.

## ARGUMENT

**I.    The City's claims are either time-barred or premature.**

Based on conduct the City says took place over 20 years ago, the City seeks to recover money it has not yet spent. Either the claims became time-barred long ago or they are not yet ripe. Whichever it is, the claims must be dismissed.

### A.    The City's claims are barred by the statute of limitations.

Under South Carolina law, the City's claims are subject to a three-year statute of limitations. *See* S.C. Code Ann. § 15-3-530; *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 806 (D.S.C. 2011). South Carolina employs a discovery rule, which provides that a cause of action accrues on the date that a "person knew or by the exercise of reasonable diligence should have known that he had a cause of action." S.C. Code Ann. § 15-3-535. "The exercise of reasonable diligence means simply that an injured party must act with some promptness where the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Fisher*, 817 F. Supp. 2d at

806 (quoting *Snell v. Columbia Gun Exch., Inc.*, 278 S.E.2d 333, 334 (S.C. 1981)).  In environ-
mental contamination cases, the question can be answered by "evidence of widespread publicity
and awareness of the alleged contamination."  *Hedgepath v. Am. Tel. & Tel. Co.*, 559 S.E.2d 327,
337 (S.C. Ct. App. 2001).  Courts use an objective, not a subjective, standard when determining
when the limitations period began to run.  *Burgess v. Am. Cancer Soc'y*, 386 S.E.2d 798, 800 (S.C.
Ct. App. 1989).

By the City's own words, there was widespread awareness of PFAS contaminated drinking
water sources well over three years ago.  As the City alleges, EPA published provisional drinking
water health advisories for short-term exposure to PFOA and PFOS in 2009.  Compl. ¶ 28.  Then,
in 2016, EPA published lifetime health advisory levels for PFAS in drinking water.  *Id.* ¶ 29.  The
City makes no effort to allege that it was unaware of these advisories at the time they issued, and
for good reason: As a public water system, the City has an ongoing statutory obligation to identify
and prevent "potential hazards to the health of the consumers" in the water it provides.  S.C. Code
Ann. § 44-55-40(D).  Nor can the City allege, consistent with its Rule 11 obligations, that it was
unaware of the presence of PFOA and PFOS in its water supply until three years ago.  In 2012,
EPA directed public water systems to test for PFOA, PFOS, PFNA, PFHxS, PFHpA, and PFBS
between 2013 and 2015.  77 Fed. Reg. 26,072, 26,074.  This monitoring requirement applied to all
public water systems that serve more than 10,000 people.  *Id.* at 26,075.  The City, according to
the Complaint, serves "over 34,000 customers."  Compl. ¶ 16.  No later than 2016, then, the City
"knew or by the exercise of reasonable diligence should have known that he had a cause of action."
S.C. Code Ann. § 15-3-535.

Putting the Complaint aside, there is far more publicly available information that the City
omitted from its Complaint, presumably to avoid a time bar on its claims.  For example, South

Carolina's Department of Health and Environmental Control ("DHEC") began testing public drinking water systems throughout the state for PFAS back in 2020. *See* PFAS Drinking Water Sampling Results, S.C. Dep't of Env't Servs. (last updated Apr. 17, 2024).[4] Other state agencies took action well before three years before the City filed suit, including DHEC's Bureau of Water releasing a strategy to assess the impact of PFAS on drinking water in the state in January 2020. The Court can take judicial notice of these facts without converting this motion to dismiss into a motion for summary judgment. *See Grubbs v. Wal-Mart Stores, Inc.*, 514 F. Supp. 3d 820, 826 n.1 (D.S.C. 2021).

Even without the public records and government action, the City's Complaint demonstrates that knowledge of PFAS in South Carolina's drinking waters was well known more than three years before the City sued 3M. Had the City exercised reasonable diligence, it would have known it had a cause of action against 3M. The City's claims are thus time-barred and the Court should grant the motion to dismiss.

### B.     The Complaint does not plausibly establish the City's entitlement to the relief it requests.

Even if the City's claims are not time-barred, the City has not established its entitlement to relief. Beyond conclusory statements that it has "suffered injury to its property rights" or a "loss in [property] value," the City seeks money "to fund the evaluation, testing, acquisition, installation, operation, and maintenance of water treatment technologies at [its] SWTP that will remove [3M's] PFAS from drinking water." Compl. ¶¶ 7, 92; *see id.* ¶¶ 94–95, 101, 104, 107, 117, 132, 143, 156, 164 (similar). The factual allegations, however, do not support that relief.

---

[4]     *Available     at*     https://des.sc.gov/programs/bureau-water/and-polyfluoroalkyl-substances-pfas/pfas-drinking-water-sampling-results.

The City cannot recover these funds as "compensatory and consequential damages," *id.* ¶ 7, because there are no allegations of past financial loss. "The purpose of actual or compensatory damages is to compensate a party for injuries suffered or losses sustained." *Clark v. Cantrell*, 529 S.E.2d 528, 533 (S.C. 2000). As a result, a plaintiff may not recover "for a risk of harm that has not actually occurred." *Carolina Winds Owners' Ass'n v. Joe Harden Builder, Inc.*, 374 S.E.2d 897, 905 (S.C. Ct. App. 1988). To support its request for compensation, the City states that it "requires new water treatment technologies." Compl. ¶ 6. But it does not allege that it has actually spent money or taken any other step towards implementing water treatment upgrades—only that it will need to complete those upgrades by 2031, possibly with financial support from the federal government. *Id.* ¶¶ 41–42; *see supra* at 4. It is therefore anyone's guess whether or when the City will incur a financial loss that might support a demand for damages. Under blackletter law, however, "[n]either the existence, causation[,] nor amount of damages can be left to conjecture, guess or speculation." *Gray v. S. Facilities, Inc.*, 183 S.E.2d 438, 444 (S.C. 1971).

Apparently aware of this problem, the City seeks to reframe its relief as "equitable and injunctive" "abatement." Compl. ¶¶ 7, 93, 95–96, 105, 107–08. Yet the City barely hides the fact that what it seeks is not "an injunction . . . to abate an alleged . . . nuisance," *LeFurgy v. Long Cove Club Owners Ass'n*, 443 S.E.2d 577, 578 (S.C. Ct. App. 1994), but the *payment of money* "to fund" its future upgrades "at [its] SWTP," Compl. ¶¶ 7, 94–95, 105–07, 117; *accord id.* at 36 (prayer for relief). It is well-settled, however, that "[a] plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979); *accord, e.g.*, *White v. Prisma Health*, 2022 WL 22888828, at *11 (D.S.C. Apr. 6, 2022) ("Plaintiff cannot obtain what is clearly monetary, legal relief . . . in the guise of an injunction.").

At any rate, the City does not come close to satisfying the requirements for obtaining equitable relief in federal court. *See SSMC, Inc., N.V. v. Steffen*, 102 F.3d 704, 708 (4th Cir. 1996) ("'[S]tate law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts.'"). "[T]o obtain a permanent injunction in any type of [federal] case," a plaintiff must establish (among other things) "'that it has suffered an irreparable injury,'" and "'that remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (citation omitted). The City asserts without elaboration that it has suffered an "irreparable injury for which there is no adequate remedy at law." Compl. ¶¶ 94, 106. But this is nothing more than "'a legal conclusion couched as a factual allegation.'" *Iqbal*, 556 U.S. at 678. After all, "an injury or claim is irreparable only if it cannot be undone through monetary remedies." *Tiffany v. Forbes Custom Boats, Inc.*, 1992 WL 67358, at *8 (4th Cir. 1992) (internal quotations omitted); *accord, e.g.*, *Gracepointe Church v. Jenkins*, 2006 WL 1663798, at *3 (D.S.C. June 8, 2006). And, as the City's demand for "damages to be proved at trial" confirms, Compl. ¶ 92, the cost of alterations to a water treatment facility is precisely the kind of harm that *can* "be undone through monetary remedies," *Tiffany*, 1992 WL 67358, at *8.

The Court should dismiss the City's claims, or at the very least strike the requested relief to which the City is not entitled. *See Mitchell v. Lydall, Inc.*, 1994 WL 38703, at *4 (4th Cir. 1994) (affirming striking of request for relief at Rule 12 stage).

## II.     3M is not liable for nuisance.

The City's nuisance claims (Counts I, alleging private nuisance; and Count II, alleging public nuisance) fail because 3M cannot be held responsible for an alleged nuisance that it does not control. Under South Carolina law, "one who has no control over property at the time of the

alleged nuisance cannot be liable therefor." *Clark v. Greenville Cnty.*, 437 S.E.2d 117, 119 (S.C. 1993); *see also FOC Lawshe Ltd. P'ship v. Int'l Paper Co.*, 574 S.E.2d 228, 231 (S.C. Ct. App. 2002) (for nuisance liability to arise, the defendant must have had control over the property "at the time of the alleged nuisance").

The City's allegations cannot show that 3M exercised the control, dominion, or ownership required for nuisance liability. The City does not allege that a facility controlled by 3M discharged PFAS into its water source; indeed, the City acknowledges that 3M's alleged liability rests on manufacturing and selling PFAS. *See* Compl. ¶¶ 2, 5, 44–45, 81, 84. The City likewise does not allege that 3M had legal authority to enter the PFAS Users' properties or direct their handling, release, or discharge of products or waste that contain PFAS. Nor does 3M control the public waterways the City alleges are contaminated.

Instead, the Complaint asserts that 3M "was directly involved in, and exercised control over, its customers' use, handling, application and disposal of 3M's products." *Id.* ¶ 68. But the allegations that follow prove this to be a "naked assertion devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678, that fails to state a claim. The Complaint merely alleges that 3M sold products to these unnamed, non-party customers, and then continued to communicate with them about those products' use. Compl. ¶¶ 68–77. These allegations do not add up to an allegation of control, which is required by South Carolina law, and lacking here. The Court should dismiss the City's nuisance claims.

## III.     The City lacks a cause of action for trespass.

The City's trespass claim likewise fails to state a claim under South Carolina law because the City has not plausibly alleged that 3M committed any intentional act that invaded the City's property. To state a claim for trespass, a plaintiff must allege (1) an affirmative act; (2) the intentional invasion of land; and (3) harm that is the direct result of the invasion. *Snow v. City of*

*Columbia*, 409 S.E.2d 797, 802 (S.C. Ct. App. 1991).  The defendant "must intend the act which in law constitutes the invasion of the plaintiff's right."  *Id.*  This rule applies with equal force to trespass claims out of alleged contamination: merely "passively 'allowing'" contamination to occur via the migration of contaminants is not sufficient.  *Tillman v. Highland Indus.*, 486 F. Supp. 3d 1026, 1041 (D.S.C. 2020).[5]

Here, as noted above, the City fails to allege any affirmative act by 3M that resulted in the invasion of the City's land—to the contrary, it alleges that 3M sold products to the PFAS Users, and those PFAS Users discharged PFAS-containing wastewater that ultimately made its way to the City's intake.  The City does not even allege that 3M "allowed" these discharges to happen, as 3M could not plausibly "allow" products over which it retained no control to trespass onto the City's property from a facility over which 3M had no control.  The City's trespass claim should be dismissed.

## IV.    The City's negligence-based claim fails.

The City's negligence claim (Count IV) fails because the City fails to adequately plead a critical element of that claim under South Carolina law.  Specifically, the City asserts that 3M had a duty to all foreseeable third parties, and to control all entities that purchased its products.  But these are not recognized duties under South Carolina law.

3M did not owe a duty to the City because it had no relationship to the City, and it did not create any risk that its unidentified customers would contaminate City property.  "An essential element in a cause of action for negligence is the existence of a legal duty of care owed by the

---

[5] Though the court in *Tillman* ultimately denied defendant's motion to dismiss the trespass claim in that case, it did so because of facts specific to that case involving the legal relationship between the defendant and the party that purportedly engaged in the discharge.  *Id.* at 1041.  Here, as noted, the City has alleged no relationship between 3M and the PFAS Users beyond 3M's sale of its products to the PFAS Users, which is nothing like the relationship the court found sufficient to support liability in *Tillman*.

defendant to the plaintiff." *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 276 (S.C. 2003). The question of "whether the defendant owed a duty of care to the plaintiff" is a question the court must determine "as a matter of law," and a duty arises "from the relationship between the alleged tortfeasor and the injured party." *Id.* at 276–77. In general, South Carolina law "recognizes no affirmative duty to control the conduct of another or to warn a third person of danger." *McCord v. Laurens Cnty. Health Care Sys.*, 838 S.E.2d 220, 296 (S.C. Ct. App. 2020). While South Carolina courts do recognize exceptions to this principle, *see, e.g.*, *Faile v. S.C. Dep't of Juvenile Just.*, 566 S.E.2d 536, 546 (S.C. 2002), the Complaint fails to include any plausible allegations that would suggest any of those exceptions apply here. For example, the Complaint fails to allege that 3M— as opposed to the unidentified PFAS Users that bought 3M's unidentified products and then disposed of them—"negligently or intentionally create[d] the risk" that led to the City's injuries. *Faile*, 566 S.E.2d at 546. To the contrary, 3M did not force the PFAS Users to purchase or dispose of any product in any particular way, and the Complaint does not allege otherwise. Moreover, "[i]n the absence of a duty to prevent an injury, foreseeability of that injury is an insufficient basis on which to rest liability," as "[t]he concept of duty in tort liability will not be extended beyond reasonable limits." *Huggins*, 585 S.E.2d at 277.

Here, the City cannot hold 3M liable for what the City alleges the PFAS Users did. The South Carolina Supreme Court's decision in *Huggins* is instructive. In that case, a victim of identity fraud brought an action against various issuers of credit cards, alleging that the issuers acted negligently in issuing credit cards in the plaintiff's name to an imposter who had stolen plaintiff's personal information. *Id.* at 276. When issuers moved to dismiss, arguing that they had no duty to the plaintiff, who was not their customer, the South Carolina Supreme Court agreed, holding that, "[t]he relationship, if any, between credit card issuers and potential victims of identity theft

is far too attenuated to rise to the level of a duty between them." *Id.* at 277. The Court further noted that "[e]ven though it is foreseeable that injury may arise by the negligent issuance of a credit card, foreseeability alone does not give rise to a duty." *Id.*

The South Carolina Supreme Court's reasoning in *Huggins* applies here to preclude the City's negligence claims. Notably, the City alleges **no relationship whatsoever** between the City and 3M that could give rise to a duty of care. Rather, the Complaint alleges a duty of care—apparently owed to the world at large—regarding the manufacture and dissemination of 3M's product that, at best, arises from 3M's "superior knowledge" regarding its products' chemical characteristics. Compl. ¶ 120. Just as issuing a credit card to a fraudster did not make the issuer liable for the fraudster's subsequent actions in *Huggins*, selling a product to a purchaser does not make the seller liable for the purchaser's subsequent actions. The City itself concedes that the PFAS Users, not 3M, disposed of the chemicals. *See, e.g.*, Compl. ¶ 45 (alleging that 3M "sold and otherwise supplied products containing [PFAS] to *facilities* that discharge to surface waters upstream from Plaintiff," and "*3M's customers* disposed of the PFAS-contaminated wastewater by discharging it directly, or indirectly via public WWTPs, to surface waters") (emphasis added). As a matter of law, 3M is not responsible for what the PFAS Users allegedly did, and the Court should reject the City's invitation to "extend[]" "[t]he concept of duty in tort liability" "beyond reasonable limits" by imposing on 3M an apparently unlimited worldwide duty to govern the unilateral acts of its customers regarding the products 3M supplies. *Huggins*, 585 S.E.2d at 277.

## V.     The City fails to state a strict liability claim for ultrahazardous activity.

The City's ultrahazardous-activity strict liability claim (Count VI) fails because manufacturing lawful chemicals is not a basis for imposing strict liability under South Carolina law. In an effort to expand strict liability far beyond the doctrine's limits under South Carolina law, the City alleges that 3M engaged in an ultrahazardous activity when it "manufactured, formulated, handled,

sold, and/or distributed products containing [PFAS] to customer facilities upstream from Plaintiff" which then "discharged to surface waters" that the City draws water from. Compl. ¶ 136. In addition to the City's tacit acknowledgment that the customers to whom 3M sold PFAS (*i.e.*, the PFAS Users) are in fact the parties responsible for allowing chemicals to escape into the City's water supply, the City suggests that 3M should be held strictly liable simply for allegedly supplying chemicals purportedly containing trace amounts of PFAS to customers. Such a claim has no basis in South Carolina law.

South Carolina law recognizes only a few "narrowly defined" categories of strict liability, "such as cattle trespass, public callings, certain kinds of nuisances, and ultra-hazardous activities." *Greenberg Inv. P'Ship, L.P. v. Cary's Lake Homeowners Ass'n*, 2016 WL 2766675, at *5 (D.S.C. May 13, 2016). In general, courts—particularly federal courts performing an *Erie* guess—have been reluctant to broaden the scope of activities that can be considered ultrahazardous beyond what the legislature has already deemed as such. *See, e.g.*, *Winley v. Int'l Paper Co.*, 2012 WL 13047989, at *11 (D.S.C. Oct. 23, 2012) (quoting *Shockley v. Hoechst Celanese Corp.*, 996 F.2d 1212 (table), 1993 WL 241179, at *5 (4th Cir. June 28, 1993)) ("[I]n the absence of guidance from South Carolina's courts or legislature, we as a federal tribunal refuse to sanction such an extension of the state's strict liability doctrine. . . .").

Neither South Carolina's legislature nor its Supreme Court has decided that manufacturing or selling chemicals is an ultrahazardous activity subject to strict liability. *See Hatfield v. Atlas Enters., Inc.*, 262 S.E.2d 900, 901 (S.C. 1980) (declining to extend strict liability "to the manufacturers or distributors of ultrahazardous products"); *Ravan v. Greeneville Cnty.*, 434 S.E.2d 296, 304–05 (S.C. Ct. App. 1993) (finding no reversible error in trial court's refusal to instruct the jury that disposing toxic chemicals was an abnormally dangerous activity, reasoning that South

Carolina law does not recognize it as such). Indeed, in *Ravan*, the Court of Appeals explained that if the merits issue of whether manufacturers of toxic substances were strictly liable were before it, the court "would not be inclined to hold the corporate respondents' activities were abnormally dangerous as a matter of law." *Id.* But because deciding the issue was unnecessary to resolve the case, the court left "that determination to [the] Supreme Court." *Id.* In more than three decades since *Ravan*, neither the legislature nor the South Carolina Supreme Court has extended strict liability to manufacturers. This Court should likewise decline to extend strict liability beyond what has been recognized by South Carolina law.

## VI.     The City fails to state a strict products liability claim for a design defect.

The City's design-defect strict liability claim (Count VII) fails because the City has not plausibly alleged that the unidentified products that 3M sold to the unidentified PFAS Users contained a design defect that proximately caused the City's injuries.

> In South Carolina, "[i]n any products liability action, a plaintiff must establish three things: (1) he was injured by the product; (2) the product was in essentially the same condition at the time of the accident as it was when it left the hands of the defendant; and (3) the injury occurred because the product was in a defective condition unreasonably dangerous to the user."

*Norton v. Gen. Motors LLC*, 2020 WL 4218232, at *2 (D.S.C. July 23, 2020) (quoting *Graves v. CAS Med. Sys., Inc.*, 735 S.E.2d 650, 658 (S.C. 2012)) (brackets in original).

The City has failed to allege facts making it plausible that 3M's products were "in essentially the same condition at the time of the accident as [they were] when [they] left the hands of the defendant." *Graves*, 737 S.E.2d at 658. To the contrary, the Complaint alleges that 3M supplied "products that contain or degrade to one or more . . . PFAS" to unidentified entities that in turn "discharge[d] wastewater." Compl. ¶ 2. In other words, the "accident" was the discharge by 3M's customers of contaminated ***wastewater***, indicating that the customers used whatever product

they purchased in their manufacturing process and in turn discharged some kind of waste from that manufacturing process. The Complaint does not allege that 3M sold contaminated wastewater to its unidentified customers or even that the product 3M sold appeared untransformed in wastewater, and the Complaint therefore does not plausibly allege that any of 3M's products at issue were in essentially the same condition as when they left 3M's hands.

The design defect claim fails as a matter of law because the City has not adequately pleaded that 3M's chemicals were defective or unreasonably dangerous. In South Carolina, "the exclusive test in a products liability design case is the risk-utility test[,] with its requirement of showing a feasible alternative design." *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 14 (S.C. 2010). That is, a plaintiff must plead (and ultimately prove) a "reasonable" and "feasible alternative design" "and show how [the] alternative design would have prevented the product from being unreasonably dangerous." *Id*. at 16. Courts then apply a balancing test where "numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the likelihood and potential seriousness of injury and the obviousness of danger." *Bragg v. Hi-Ranger, Inc.*, 462 S.E.2d 321, 328 (S.C. Ct. App. 1995). "[A] product is not in a defective condition unreasonably dangerous merely because it 'can be made more safe.'" *Branham*, 701 S.E.2d at 16. Further guiding this test is the evidentiary rule providing "that whether a product is defective must be measured against information known at the time the product was placed in the stream of commerce. When a claim is asserted against a manufacturer, post-manufacture evidence is generally not admissible." *Id.* at 17.

The risk-utility analysis ends before it can begin because the City has not plausibly alleged a feasible alternative design. The City asserts that there are "nonfluorinated alternative products that d[o] not pose the same health and environmental risks as the PFAS products." Compl. ¶ 64.

16

But it bases this assertion on the "*current*" availability of these products, *id.* ¶ 65 (emphasis added), not on the availability of alternatives over twenty years ago, when 3M phased out PFOS and PFOA (the kinds of PFAS at issue). To the contrary, the City concedes that it was only *during* the "phase out" that 3M "considered shifting away from PFAS chemistry entirely in favor of nonfluorinated alternative products." *Id.* ¶ 64. And, again, there are no factual allegations suggesting that, at the time, this shift would have been feasible.

This threshold problem aside, the City has not alleged sufficient facts to make any risk-utility analysis possible. Consider, for example, "the usefulness and desirability of the product." *Bragg*, 462 S.E.2d at 328. The City alleges 3M sold "products [that] contained or degraded to" PFOA or PFOS. Compl. ¶ 67. But the City does not allege what those products were, who the PFAS User purchasers were, what those purchasers needed 3M products for, or even what industry the PFAS Users were in. It is therefore impossible to compare the usefulness and desirability of PFOA and PFOS against a proposed alternative. So too with "the cost involved for added safety." *Bragg*, 462 S.E.2d at 328. Without a single allegation about the relative cost of producing an alternative instead of PFOA and PFOS before 2002, the risk-utility analysis is not a balancing test, but guesswork.

Federal courts in other jurisdictions with substantially similar alternative-design require-ments as South Carolina have therefore dismissed similar claims in PFAS cases. *See, e.g.*, *SUEZ Water N.Y. Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 560 (S.D.N.Y. 2022) ("Where a plaintiff does not plead a safer design alternative for the allegedly defective design, dismissal is required."). In *SUEZ Water*, the plaintiff failed to allege that a safer alternative design "would serve the same function as the PFAS-containing products" and instead just "recite[d] one of the elements of its cause of action without pleading any facts to render it non-conclusory." *Id.*

17

at 560–61.  So too here.  Further, by grouping all 3M's products together as "PFAS-based prod-ucts," Compl. ¶¶ 63–65, the City is essentially arguing that 3M should not have used PFAS at all.  But that claim would also fail, because "alleging that [a] product should not be used at all is insuf-ficient to satisfy the feasible alternative design element" of a product liability claim.  *Kennedy v. Covidien, LP*, 2019 WL 1429979, at *4 (S.D.N.Y. Mar. 29, 2019).

In sum, the Complaint fails to satisfy the pleading standard for design defect claims.  The City makes no allegations indicating what product or design would have been a reasonable alter-native for 3M to manufacture and sell, and further makes no attempt to address the factors relevant to the risk-utility test.  The Complaint instead recites the elements and includes vague generalities about PFAS.  The Court should dismiss the design-defect claim.

## VII.    The City fails to state a strict liability claim for failure to warn.

The City's failure-to-warn strict liability claim (Count V) fails because the City has not plausibly alleged that 3M had a duty to warn, or that any hypothetical warning by 3M would have changed anything the City did.

The City grounds its failure to warn claim in strict products liability, not negligence.  The difference between the two theories under South Carolina law is that, under strict liability, "knowledge of the condition of the product and the risks involved in that condition will be imputed to the manufacturer."  *Bragg*, 462 S.E.2d at 326.  Under either theory, the City must prove that the manufacturer "kn[e]w or ha[d] reason to know the product is or is likely to be dangerous for its intended use; [the manufacturer] ha[d] no reason to believe the user will realize the potential dan-ger; and, the [manufacturer] fail[ed] to exercise reasonable care to inform of its dangerous condi-tion or of the facts which make it likely to be dangerous."  *Livingston v. Noland Corp.*, 362 S.E.2d 16, 18 (S.C. 1987).

18

To start, for the reasons stated above with respect to the City's negligence claim, the City also failed to show that 3M had a duty to the City, including a duty to warn. To hold otherwise would extend a manufacturer's duty to warn beyond purchasers to a seemingly boundless universe of downstream individuals.

Additionally, the City makes no effort to meet its "burden" of establishing "that a warning would have made a difference in the conduct of the person warned." *Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354, 359 (S.C. 1998); *see also, e.g.*, *Little v. Brown & Williamson Tobacco Corp.*, 243 F. Supp. 2d 480, 497 (D.S.C. 2001) ("The Plaintiff has offered no evidence that Mr. Little would never have begun smoking or stopped smoking had Reynolds provided a pre-1969 warning."); *Assey v. Am. Honda Motor Co.*, 2025 WL 1148512, at *8 (D.S.C. Apr. 18, 2025) ("Plaintiffs have not shown that a different warning would have made a difference in this case."). That is, the City has not alleged that, had 3M warned the City or PFAS Users, then the City or PFAS Users would have changed their behavior at all. To the contrary, if the facts permit any reasonable inference about the City's behavior, it is that a warning would *not* have made a difference: For the last ten years (if not longer), the City was aware of PFAS in its water and reports suggesting PFAS was associated with "'negative health effects,'" but it did nothing. Compl. ¶ 31; *see supra* at 3. It is only now—after 3M reached a settlement with Public Water Systems, *see In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2024 WL 1341122, at *2–3 (D.S.C. Mar. 29, 2024)—that the City has taken an interest in PFAS contamination. With or without that inference, the Complaint omits a necessary element of its failure to warn claim, and the claim must be dismissed.

## VIII.   3M is not liable for breach of implied warranties because no such warranties existed.

Finally, the City's claim for breach of implied warranties (Count VIII) fails because the City cannot adequately allege that any warranties existed between the City and 3M. The City has not alleged that the two ever had any relationship, contractual or otherwise, with one another. As

an initial matter, the City has failed to plead that any implied warranty applies to 3M's products here, let alone has the City identified which implied warranties it claims were breached. In any event, the City has failed to adequately plead a claim for breach of implied warranties.

The South Carolina Commercial Code establishes two sources of implied warranties: an implied warranty of fitness for a particular purpose, and an implied warranty of merchantability. *See* S.C. Code Ann. §§ 36-2-314, 36-2-315. "[W]here the particular purpose for which a product is purchased is also the ordinary or intended purpose of the product, the warranties of merchantability and of fitness for a particular purpose merge and are cumulative, such that a plaintiff may proceed upon either theory." *Soaper v. Hope Indus., Inc.*, 424 S.E.2d 493, 495 (S.C. 1992).

There was no implied warranty of fitness for a particular purpose. For such a warranty to exist, a plaintiff must establish that (1) "the seller at the time of contracting has reason to know any particular purpose for which the goods are required" and (2) the buyer was "relying on the seller's skill or judgment to select . . . suitable goods." S.C. Code Ann. § 36-2-315. But as to the first element, the City has not alleged that 3M products were purchased by PFAS Users for a particular purpose at all. Indeed, the City does not make *any* allegations about the identity of the PFAS Users, the purpose of 3M's products, or the precise products PFAS Users purchased. *See supra* at 17. Because the City has not alleged a 3M product was sold for a particular purpose (rather than its ordinary purpose), the City has failed to state a claim. *E.g.*, *McHugh v. Carlton*, 369 F. Supp. 1271, 1276 (D.S.C. 1974).

Nor are there allegations to support the second element, the buyer's reliance on the seller's skill or judgment. The City has not alleged, and could not plausibly allege, that it relied on 3M when purchasing PFAS or PFAS-based products from 3M—after all the City never purchased *anything* from 3M. As the City acknowledges, the relationship 3M had as a seller was with the PFAS

20

Users, not the City. *See* Compl. ¶ 159. Because the City never relied on 3M for anything, there is no implied warranty of fitness for a particular purpose.

To be sure, South Carolina law allows certain third parties to rely on a warranty made by the defendant to a non-party purchaser, *see* S.C. Code Ann. § 36-2-318, but that rule is inapplicable here. Again, there are no allegations about the PFAS Users, so there are no allegations to suggest they relied on 3M's skill or judgment to make a purchasing decision. At any rate, the City could not rely on any warranty made to the PFAS Users because section 36-2-318 grants third-party-beneficiary status only to "natural person[s]," not to entities like the City. *Id.* And the section's official commentary makes clear that the warranty may be enforced only by those with a particularly close relationship to the purchaser, not an unrelated party like the City. *See id.* official comment 2 ("The purpose of this section is to give the buyer's family, household and guests the benefit of the same warranty which the buyer received.").

The implied warranty of merchantability is equally inapplicable. The City has not alleged any facts that 3M's unspecified products were not "merchantable." S.C. Code Ann. § 32-2-314(1). It does not, for example, allege those products were "objection[able] in the trade under [a] contract description," not "of fair average quality within [that contract] description," not "fit for the ordinary purposes for which such goods [were] used, or "[in]adequately . . . packaged." *Id.* § 32-2-314(2). What is more, no harm is alleged to have occurred until the PFAS Users improperly disposed of PFAS-containing wastewater. *See* Compl. ¶ 45. The implied warranty of merchantability is thus another misplaced claim aimed at 3M instead of the actual wrongdoers.

Because implied warranties are such a poor fit for PFAS-related claims, there is scant caselaw discussing its applicability here. Still, when a court has substantively engaged with these claims, it has dismissed them under Rule 12(b)(6). For example, in *Maketa v. Target Corp.*, 2024

WL 4311702 (N.D. Cal. Sept. 26, 2024), the court dismissed the plaintiff's claims for breach of implied warranty because of plaintiff's conclusory allegations that did not meet the pleading standard. *Id.* at *4. The City similarly recites legal elements without supporting facts, and this Court should similarly dismiss the claim.

## CONCLUSION

The City's claims are untimely, but even on the merits, the City has no valid basis to recover from 3M based on any harm it has allegedly suffered through the conduct of PFAS Users. The City's claims should be dismissed.

Respectfully submitted,

s/ Brian C. Duffy
Brian C. Duffy (Fed ID No. 9491)
DUFFY & YOUNG, LLC
96 Broad Street
Charleston, SC 29401
(843) 720-2044
(843) 720-2047
bduffy@duffyandyoung.com
*Counsel for Defendant 3M Company*

July 28, 2025
Charleston, South Carolina